**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF INDIANA**
**HAMMOND DIVISION**

| | | |
|---|---|---|
| NIKKI ELISE YURCHAK, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 2:20-cv-390-JPK |
| KILOLO KIJAKAZI, ACTING | ) | |
| COMMISSIONER OF THE SOCIAL | ) | |
| SECURITY ADMINISTRATION, | ) | |
| | ) | |
| Defendant. | ) | |

**OPINION AND ORDER**

Plaintiff Nikki Elise Yurchak filed an application for social security disability benefits, which was denied by the Commissioner of Social Security ("Commissioner") initially on October 24, 2018 and upon reconsideration on July 19, 2019. Plaintiff then requested a hearing before an Administrative Law Judge ("ALJ"), which was held on November 20, 2019. In a decision dated December 24, 2019, the ALJ found that Plaintiff was not disabled and denied benefits. Plaintiff filed an appeal with the Social Security Appeals Council, which was denied. On October 29, 2020, Plaintiff filed the present complaint seeking judicial review of the Commissioner's final decision. *See* 42 U.S.C. § 405(g). [DE 1]. The parties have consented to have this case assigned to a United States Magistrate Judge to conduct all further proceedings and to order the entry of a final judgment in this case. [DE 5]. Accordingly, this Court has jurisdiction to decide this case pursuant to 28 U.S.C. § 636(c). After carefully considering the administrative record [DE

13] and the parties' briefs [DE 15-17], the Court now reverses the ALJ's decision and remands for further proceedings.

## BACKGROUND

Plaintiff, who is presently thirty-four years old, has a long history of mental health treatment for bipolar disorder, depression, anxiety, and attention deficit disorder (ADD). She has reported outpatient mental health counseling since the age of 18, which is when she began seeing her current treating psychiatrist, Dr. Suhayl Nasr, as well as one instance of inpatient psychiatric hospitalization at the age of 19, which is when she began seeing her current treating psychologist, Karen Eggen, Ph.D. [AR 60; AR 610[1]].

### A.   RECENT MENTAL HEALTH EVENTS

Notwithstanding her long-time mental health issues, Plaintiff reports having graduated from high school with an A average, and college with a C average. [AR 610]. She was either in school or employed full-time through 2017, with her most recent full-time employment beginning in July 2011 and ending in January 2018. [AR 47, 222]. In this seven-year period, Plaintiff worked exclusively from home as a remote outpatient medical coder. [AR 222]. Plaintiff's job as a medical coder went downhill, however, starting in the fall of 2017. Plaintiff had been on maternity leave from June through August 2017, returning to work full-time in September 2017. A short time later, in October 2017, Plaintiff's mother, with whom Plaintiff had a troubled relationship, died

---

[1] Page numbers in the Administrative Record [AR] refer to the numbers assigned by the filer appearing on the lower right corner of the page, and not the numbers assigned by the Court's CM/ECF system appearing in the banner at the top of the page.

unexpectedly in a tragic accident. Plaintiff reports that in November 2017 her employer instructed her to take a temporary leave of absence because she was not meeting productivity expectations. During her temporary leave, Plaintiff continued to struggle with issues of grief, isolation, financial stress, and marital problems. When it was time for Plaintiff to return to work, she asked her employer to allow her to work part-time. But she was told there were no part-time positions available, and her employer therefore terminated her on January 26, 2018. Plaintiff applied for disability insurance benefits on February 26, 2018 [AR 79], alleging she had been disabled since January 15, 2018. [AR 198]. She later amended the alleged onset date to November 8, 2017. [AR 216]).

### B.   SELF-REPORTED SYMPTOMS

In two Function Report forms completed in August 2018 and January 2019, Plaintiff indicated that she has problems concentrating, remembering, and interacting with people without experiencing anxiety, that she has little motivation to do most things, and that she is easily overwhelmed or distracted, requiring assistance to complete tasks. She reported that stressful situations will cause her to shut down, and that she has panic attacks when she has to go someplace in the car. [AR 231-238; AR 253-260]. At the hearing before the ALJ, Plaintiff testified that there was "no way" she can concentrate or focus long enough to work at a job when she is in a manic or depressive phase. [AR 54]. She testified that she is taking medications to control those phases and had not had a full blown manic episode in "quite a while." [AR 55]. But about once a year she will suffer a hypomanic period that lasts around seven days [AR 55-56], and maybe three to four times a year, she will suffer a depressive episode that can vary in length but "sometimes last[s]

3

all winter." [AR 63-64]. Plaintiff reported that the set-back she experienced after her mother's death in October 2017 had not gotten better, and she did not think she could go back to a medical coding job anymore, even if it was part-time, because it would be too stressful for her. [AR 65-66].

Plaintiff currently lives with her husband and four-year-old son. She takes care of the house and her son, although it may take her longer than normal for her to get things done. Her husband does much of the cooking. [AR 68-69]. She recently worked three days a week washing dogs for her cousin, who is a dog groomer. Although she was having problems with her legs standing up all day, she answered "no" when asked if she ever missed her work at the dog groomer because she was not able to motivate herself to go to her job. [AR 58-59]. At one point, her cousin asked her to work more hours, but she did not feel she could mentally or emotionally handle more days than the three days a week she was already working. [AR 59-60]. Her income from the dog washing job was not enough to constitute substantial gainful employment.

### C.   MEDICAL OPINIONS

#### 1.   TREATING PSYCHOLOGIST

Plaintiff has been having weekly therapy sessions with Dr. Eggen for at least the past three to four years. [AR 556]. In August 2018, Dr. Eggen submitted a statement in support of Plaintiff's application for disability benefits, which she said was "in lieu of progress notes" from her therapy sessions with Plaintiff.[2] The statement indicates that

---

[2] Dr. Eggen stated that Plaintiff had been seen in her office regularly for the past 10+ years, including 38 times since January 2016. Dr. Eggen later submitted her therapy notes,

Plaintiff "has a long history of bipolar disorder." Although Plaintiff has been "treatment and medication compliant," her bipolar is "extremely medication resistant," a situation that has been further complicated by the fact that her insurance would not cover certain medications she needed to stabilize her mood. Dr. Eggen notes that Plaintiff "is a bright woman who has good judgment, attention, and memory until she has a mood swing. During a mood swing, her attention and judgment become impaired." [*Id.*]. Plaintiff's medical coder job "marginally worked for a number of years since she could work out of her home and adjust her work hours throughout the day as needed to accommodate ongoing attention/concentration difficulties. She had struggled on and off throughout the years but was able to manage because of the extreme flexibility this job afforded her. She did not need to leave her house, did not need to interact with others, and could start and stop her workday as needed, as long as she completed her hours." [*Id.*]. Dr. Eggen reports that when Plaintiff's mother died suddenly and tragically, "the stress of this, in addition to the birth of her son earlier in the year, resulted in the loss of her job." [*Id.*]. She opines that Plaintiff has "serious concentration and attention issues resulting in her being unable to concentrate reliably to complete tasks for more than 10 minutes during times she has mood swings," and that "[t]hese are unpredictable, serious, and impact her ability to obtain and keep a job." [*Id.*].

---

which were before the state agency consultant at the reconsideration level and part of the record before the ALJ. [AR 555-561, 666-669, 687-727, 736-740].

### 2.   CONSULTATIVE PSYCHOLOGICAL EXAMINER

In September 2018, Plaintiff underwent a consultative psychological evaluation by Dr. Gary Durak, who diagnosed her with generalized anxiety disorder with episodic panic and agoraphobia, moderately controlled by medications. While Dr. Durak found that Plaintiff was "adequately focused" during the examination with intact memory and logical, goal-directed thought processes, he did not state any opinions as to mental limitations she might have for purposes of work outside the home. [AR 609-614].

### 3.   STATE AGENCY PSYCHOLOGICAL CONSULTANTS

Plaintiff's application and medical records were reviewed initially by the state agency psychological consultant on October 24, 2018. The state consultant discounted Dr. Eggen's opinion that Plaintiff was unable to concentrate reliably to complete tasks for more than 10 minutes during times she has mood swings because, he said, "no treatment notes [were] provided to support this opinion" and the last treatment note in Dr. Nasr's records "noted that while [Plaintiff] complains of concentration issues, she was able to concentrate and focus during [the] app[ointment]." [AR 92]. The state consultant then observed that Plaintiff was able to care for her son and the house, could go out alone and drive, and went to stores and bought groceries once a week. He also noted that her employer reported she was capable of carrying out and understanding very short and simple instructions, but "[d]id not consistently meet productivity standards." [*Id.*]. The state consultant concluded that, based on "the totality of evidence" in the file, Plaintiff was able to understand, carry out and remember simple instructions; make judgments commensurate with functions of simple, repetitive tasks; deal with routine changes in a

6

work setting; manage occasional contact with the public; and maintain at least a minimal level of relationship with others. [AR 92].

On July 19, 2019, the state agency psychological consultant at the reconsideration level "affirmed" the initial consultant's conclusions. In doing so, he indicated that he had reviewed Dr. Eggen's psychotherapy notes, which were not in the record at the time of the initial state consultant review, and noted that, in December 2018, Dr. Eggen indicated that Plaintiff had a 22 hour per week cash job as a dog groomer. [AR 109].

4.    TREATING PSYCHIATRIST

On September 3, 2019, Dr. Nasr completed a Medical Source Statement form that had been provided to him by Plaintiff's attorney. [AR 39]. In the only narrative portion of the form, Dr. Nasr noted that Plaintiff suffered from depression to mania, and poor concentration, resulting in job loss for poor performance. [AR 729].

In the remainder of the form, Dr. Nasr designated Plaintiff's mental functioning limitations with checkmarks indicating whether her limitations in certain areas of mental functioning were "none/mild," "moderate," "marked," or "extreme." [AR 729-732]. Dr. Nasr's checkmarks indicated that Plaintiff suffered:

- None/mild loss in (a) marginal adjustment, that is, having minimal capacity to adapt to changes in environment; and (b) adapting or managing oneself.

- Moderate loss in (a) understanding and remembering detailed instructions; (b) carrying out detailed instructions; (c) maintaining regular attendance and being punctual; (d) sustaining an ordinary routine without special supervision; (e) dealing with stress of semi-skilled and skilled work; (f) working in coordination with or proximity to others without being unduly distracted; (g) accepting instructions and

7

responding appropriately to criticism from supervisors; (h) adhering to basic standards of neatness and cleanliness; (j) setting realistic goals or making plans independent of others; and (k) ability to concentrate, persist or maintain pace.

- Marked loss in the areas of (a) maintaining attention and concentration for extended periods, i.e. 2 hour segments; (b) responding appropriately to changes in a routine work setting.

- Extreme loss in the areas of (a) completing a normal workday or workweek, and (b) performing at a consistent pace without unreasonable number and length of rest periods.

Dr. Nasr also indicated with a check mark that Plaintiff's impairments or treatment would cause her to be absent from work more than 3 times per month. Finally, he responded "yes" to the question "[d]oes your patient have a medically documented impairment[s] that is serious and persistent*?" The asterisk denoted a reference that spelled out the technical regulatory definition of "serious and persistent,"[3] but the definition appeared after the space where Dr. Nasr marked a check to indicate "yes" to the question.

## FIVE-STEP EVALUATIVE PROCESS

To be eligible for Social Security disability benefits, a claimant must establish that she suffers from a "disability," which is defined as an inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental

---

[3] See [AR 732 ("*Note: 'Serious and persistent' means a medically documented history of the existence of the disorder over a period of at least 2 years, and evidence of both medical treatment, mental health therapy, psychosocial support[s], or a highly structured setting(s) that is ongoing and that diminishes the symptoms and signs of the mental disorder; and marginal adjustment, that is, a minimal capacity to adapt to changes in the environment or to demands that are not already part of the person's daily life.")].

impairment that can be expected to result in death or that has lasted or can be expected to last for a continuous period of not less than twelve months. 42 U.S.C. § 423(d)(1)(A). The ALJ follows a five-step inquiry to determine whether the claimant is disabled. The claimant bears the burden of proving steps one through four, whereas the burden of proof at step five is on the ALJ. *Zurawski v. Halter*, 245 F.3d 881, 885-86 (7th Cir. 2001).

At the first step, the ALJ asks whether the claimant has engaged in substantial gainful activity during the claimed period of disability. An affirmative answer at step one results in a finding that the claimant is not disabled and the inquiry ends. If the answer is no, the ALJ moves on to the second step, where the ALJ identifies the claimant's physical or mental impairments, or combination thereof, that are severe. If there are no severe impairments, the claimant is not disabled. If there are, the ALJ determines at the third step whether those severe impairments meet or medically equal the criteria of any presumptively disabling impairment listed in the regulations. An affirmative answer at step three results in a finding of disability and the inquiry ends. Otherwise, the ALJ goes on to determine the claimant's residual functional capacity (RFC), which is "an administrative assessment of what work-related activities an individual can perform despite his limitations." *Dixon v. Massanari*, 270 F.3d 1171, 1178 (7th Cir. 2001). At the fourth step of the inquiry, the ALJ determines whether the claimant is able to perform his past relevant work given her RFC. If the claimant is unable to perform past relevant work, the ALJ determines, at the fifth and final step, whether the claimant is able to perform any work in the national economy. *See* 20 C.F.R. § 404.1520(a)(4)(i)-(v); *id.*, § 416.920(a)(4)(i)-(v). A positive answer at step five results in a finding that the claimant

is not disabled while a negative answer results in a finding of disability. *See Briscoe ex rel. Taylor v. Barnhart*, 425 F.3d 345, 352 (7th Cir. 2005); 20 C.F.R. § 404.1520(a)(4)(v).

## THE ALJ'S DECISION

The ALJ made the following findings relevant to Plaintiff's arguments in this appeal:[4]

>     1.    The claimant meets the insured status requirements of the Social Security Act through June 30, 2023.

>     2.    The claimant has not engaged in substantial gainful activity since November 8, 2017, the amended alleged onset date.

>     3.    The claimant has the following severe impairments: bradycardia; hypotension; occipital migraine headaches; bipolar disorder; and attention deficit hyperactivity disorder (ADHD). The claimant also has the non-severe impairments of glaucoma and hypothyroidism.

>     4.    The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments. The severity of the claimant's mental impairments, considered singly and in combination, do not meet or medically equal the criteria of Listings 12.04 and 12.11.

>     5.    The claimant has the residual functional capacity to perform a full range of work at all exertional levels but with the following non-exertional limitations: the claimant can never climb ladders, ropes or scaffolds but can frequently climb ramps and stairs; and frequently balance, stoop, kneel, crouch, and crawl. The claimant can never be exposed to hazards, including unprotected heights or dangerous moving machinery. The claimant can understand, remember, and carry out work that consists of simple, routine tasks requiring only simple, routine judgments. The claimant can handle only simple workplace changes. The claimant can

---

[4] The paragraphs listed herein correspond with the paragraphs in the ALJ's decision.

perform work that requires no more than brief, superficial interaction with the public (meaning no more involved interaction than answering discrete questions such as the location of an item in a store); and occasional interaction with coworkers with no tandem tasks or teamwork. The claimant can have only occasional exposure to bright sunshine or bright, flashing lights. The claimant requires work free of fast-paced or timed piece rate production but can meet end of day goals.

6. The claimant is unable to perform any past relevant work.

7-8. The claimant was born on May 10, 1987, and was 30 years old on the alleged disability onset date, which is defined as a younger individual. The claimant has at least a high school education and is able to communicate in English.

9-10. Transferability of job skills is not material to the determination of disability because the clamant is "not disabled," whether or not she has transferable job skills. Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that claimant can perform, including hand packager, assembler, electrical assembler, and bench assembler.

11. The clamant has not been under a disability from November 8, 2017 through the date of the ALJ's decision.

*See* [AR 15-26].

## STANDARD OF REVIEW

The question before the Court upon judicial review of the Commissioner's final decision pursuant to 42 U.S.C. § 405(g) is not whether the claimant is in fact disabled, but whether the ALJ's decision "applies the correct legal standard and is supported by substantial evidence." *Summers v. Berryhill*, 864 F.3d 523, 526 (7th Cir. 2017); *see* 42 U.S.C. § 405(g). "[I]f the Commissioner commits an error of law," the Court may reverse the

decision "without regard to the volume of evidence in support of the factual findings." *White v. Apfel*, 167 F.3d 369, 373 (7th Cir. 1999). A reversal may also be called for "if the ALJ based the decision on serious factual mistakes or omissions." *Beardsley v. Colvin*, 758 F.3d 834, 837 (7th Cir. 2014) (citing *Sarchet v. Chater*, 78 F.3d 305, 309 (7th Cir. 1996)). "The ALJ also has a basic obligation to develop a full and fair record," *id.*, but the Court must accept the Commissioner's factual findings as conclusive if they are supported by substantial evidence, which is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Moore v. Colvin*, 743 F.3d 1118, 1120-21 (7th Cir. 2014) (quoting *Richardson v. Perales*, 402 U.S. 389, 401 (1971)). "'Where conflicting evidence allows reasonable minds to differ as to whether a claimant is entitled to benefits,' the court must defer to the Commissioner's resolution of that conflict." *Beardsley*, 758 F.3d at 837 (quoting *Binion v. Chater*, 108 F.3d 780, 782 (7th Cir. 1997)).

The Court reviews the entire administrative record but does not "reweigh evidence, resolve conflicts, decide questions of credibility, or substitute [its] own judgment for that of the Commissioner." *McKinzey v. Astrue*, 641 F.3d 884, 890 (7th Cir. 2011) (quoting *Lopez ex rel. Lopez v. Barnhart*, 336 F.3d 535, 539 (7th Cir. 2003)). Nevertheless, the Seventh Circuit has "repeatedly admonished ALJs to 'sufficiently articulate [their] assessment of the evidence to assure [the court] that [they] considered the important evidence and ... to enable [the court] to trace the path of [their] reasoning.'" *Scott v. Barnhart*, 297 F.3d 589, 595 (7th Cir. 2002) (quoting *Hickman v. Apfel*, 187 F.3d 683, 689 (7th Cir. 1999)). The ALJ must "build an 'accurate and logical bridge from the evidence to [his or her] conclusion'" so that the reviewing court "may assess the validity

of the agency's ultimate findings and afford a claimant meaningful judicial review." *Id.* (citations omitted).

## ANALYSIS

Plaintiff raises two arguments for reversal of the ALJ's decision. First, she contends that the ALJ erred in concluding that her bipolar disorder did not meet or exceed the Listing 12.04, paragraph C criteria. Second, she argues that the ALJ's RFC findings and the hypothetical she posed to the vocational expert ("VE") failed to account for the ALJ's finding that Plaintiff has moderate limitations in concentration, persistence, and pace ("CPP").

### A. WHETHER THE ALJ PROPERLY APPLIED THE LISTING 12.04, PARAGRAPH C CRITERIA

"Under a theory of presumptive disability, a claimant is eligible for benefits if she has an impairment that meets or equals an impairment found in the Listing of Impairments." *Barnett v. Barnhart*, 381 F.3d 664, 668 (7th Cir. 2004) (citing 20 C.F.R. § 404.1520(d); 20 C.F.R. Pt. 404, Subpt. P, App. 1). "In considering whether a claimant's condition meets or equals a listed impairment, an ALJ must discuss the listing by name and offer more than a perfunctory analysis" of it. *Id.* A claimant "has the burden of showing that [her] impairments meet a listing and [she] must show that [her] impairments satisfy all of the various criteria specified in the listing." *Ribaudo v. Barnhart*, 458 F.3d 580, 583 (7th Cir. 2006). However, the "ALJ should mention the specific listings [she] is considering and [her] failure to do so, if combined with a 'perfunctory analysis,'

may require remand." *Id.*; *see Wiszowaty v. Astrue*, 861 F. Supp. 2d 924, 938 (N.D. Ind. 2012).

The listing criteria for bipolar disorder are found at 20 C.F.R. Pt. 404, Subpart P, App. 1, § 12.04 (Depressive, Bipolar and Related Disorders). Listing 12.04 consists of three paragraphs, designated A, B, and C. To be presumptively disabling, Plaintiff's impairment must satisfy paragraph A and either paragraph B or paragraph C. *See id.* § 12.00A(2).

Paragraph A "includes the medical criteria that must be present in [the claimant's] medical evidence," *id.* § 12.00A(2)(a), requiring medical documentation of either a depressive order, *id.* § 12.04(A)(1), or bipolar disorder, *id.* § 12.04(A)(2). Ten characteristics of depressive disorder are listed, of which the medical documentation must show at least five, while seven characteristics of bipolar disorder are listed, of which the medical documentation must show at least three. *Id.* § 12.04A. The ALJ did not discuss whether Plaintiff presented sufficient evidence to meet the paragraph A criteria, apparently assuming that she had. Therefore, the Court will do the same.[5]

The paragraph B criteria are used to assess how the claimant's mental disorder limits her functioning in the work setting. *Id.* § 12.00A(2)(b); *see also id.* § 12.00F ("We will

---

[5] The Commissioner asserts that Plaintiff "makes no attempt to demonstrate that her depression was sufficiently severe as to meet the requirements of subsection A of Listing 12.04." [DE 16 at 4]. This argument is rejected pursuant to *SEC v. Chenery Corp.*, 318 U.S. 80, 87–88 (1943). *See Kastner v. Astrue*, 697 F.3d 642, 648 (7th Cir. 2012) ("Under the *Chenery* doctrine, the Commissioner's lawyers cannot defend the agency's decision on grounds that the agency itself did not embrace.").

determine whether you are able to use each of the paragraph B areas of mental functioning in a work setting."). The ALJ must examine the claimant's abilities in four areas: (B1) understanding, remembering, or applying information; (B2) interacting with others; (B3) concentrating, persisting, or maintaining pace; and (B4) adapting or managing oneself. *Id.*; *see also id.* §§ 12.00E, 12.04B. To meet the listing criteria for paragraph B, a claimant must have at least two "marked" limitations or one "extreme" limitation of the four listed areas. *Id.* §§ 12.00A(2); 12.04B. After setting forth the paragraph B criteria, the ALJ found that Plaintiff had a mild limitation in the first listed area, and moderate limitations in the remaining three areas. [AR 18-19]. Therefore, the ALJ concluded, Plaintiff did not meet the paragraph B listing criteria. [AR 19]. Plaintiff does not challenge that finding.

Finally, paragraph C imposes a "serious and persistent" requirement. *Id.* § 12.04C. The criteria under this requirement are divided into three parts: there must be a medically documented history of the existence of the disorder over a period of at least 2 years, *id.* § 12.04C; and there must be evidence satisfying both paragraph C1 and paragraph C2, *id.* 12.04C(1), (2). *See id.* §§ 12.00A(2)(c), 12.00G. Paragraph C1 requires evidence of "[m]edical treatment, mental health therapy, psychosocial support(s), or a highly structured setting(s) that is ongoing and that diminishes the symptoms and signs of [the claimant's] mental disorder." *Id.* § 12.04C(1); *see also id.* § 12.00G(2)(b). Paragraph C2 requires evidence of "[m]arginal adjustment, that is, [the claimant] ha[s] minimal capacity to adapt to changes in [her] environment or to demands that are not already part of [her] daily life." *Id.* § 12.04C(2). Unlike in her discussion of paragraph B, the ALJ did

not identify the paragraph C criteria. Instead, she noted that she "has also considered whether the 'paragraph C' criteria are satisfied," and immediately followed with the conclusion that "the evidence fails to establish" they are. [AR 19]. The ALJ then briefly explained her conclusion:

> At the hearing, the claimant's representative argued that the claimant meets the C criteria due to her inability to adapt to changes in her environment (Hearing Testimony). The undersigned notes that the doctor, Suhayl Nasr, M.D., found that the claimant had no limitations in adapting or managing oneself (Exhibit 17F). The claimant further stated at the consultative psychological examination that she took care of her own personal needs, cooked, and did the normal cleaning (Exhibit 8F). The claimant also takes care of her young son (Exhibit 16F, Hearing Testimony). The record shows as well that the claimant worked grooming dogs (Exhibit 8D).

[AR 19].

The Court disagrees with Plaintiff's assertion that it is "unclear whether the ALJ did not consider any of the requirements of 'paragraph C' to be met or only some of the requirements." [DE 15 at 10; DE 17 at 3]. The ALJ begins her discussion of paragraph C with a reference to "claimant's representative['s] argu[ment] that the claimant meets the C criteria due to her inability to adapt to changes in her environment." [AR 19]. Adapting to changes in one's environment is the C2 criterion. Therefore, it is clear the ALJ found that was the criterion Plaintiff failed to meet.[6]

---

[6] To the extent that Plaintiff is suggesting that the ALJ's decision should be reversed and remanded due to the ALJ not having made any findings regarding the initial requirement in paragraph C and the C1 criterion, that argument is without merit as the Court will simply assume that those other criteria have been satisfied here. *See* footnote 5, *supra.*

Plaintiff also argues that the ALJ's four-sentence analysis of the C2 criteria is perfunctory and fails to provide an adequate basis for concluding that the ALJ's step three finding is supported by substantial evidence. [DE 15 at 11]; *see Ribaudo,* 458 F.3d at 583 (ALJ's "two-sentence discussion" of Listing 1.04(A) was "cursory"); *Barnett*, 381 F.3d at 668 (two-sentence "perfunctory" listing analysis was inadequate). To begin with, the four sentence discussion reflects the ALJ's analysis of paragraph C only; the ALJ's entire discussion of Listing 12.04 is longer than that. In addition, this case differs from *Sprankles v. Saul*, No. 1:18-cv-415-JD, 2020 WL 967897 (N.D. Ind. Feb. 27, 2020), which Plaintiff cites, wherein the court remanded because the ALJ "made a cursory finding that 'the evidence fails to establish the presence of the "paragraph C" criteria of the applicable mental disorder listing,' but provided *no* explanation for how she found that they were not satisfied." *Id.* at *3 (emphasis added). Here, the ALJ did provide an explanation. In addition, in *Sprankles*, the court noted that there was "at least *some* evidence relating to the second criteria of paragraph C demonstrating [the plaintiff's] minimal capacity to adapt to changes in her environment." *Id.* at *3 (emphasis added). Here, however, there is none. The absence of evidence to support the C2 criterion is significant because the Seventh Circuit has held that, even where an ALJ's Listing discussion is insufficient, to obtain remand the claimant must still provide evidence that her impairment satisfies all of the listing's criteria. *See Sosinski v. Saul*, 811 F. App'x. 380, 381 (7th Cir. 2020) (holding that, even if the ALJ does not "offer more than perfunctory analysis of the listing[,] … we do not reverse if the claimant fails to show that [she] meets the criteria for that listing"); *Knox v. Astrue*, 327 F. App'x 652, 655 (7th Cir. 2009) ("Although an ALJ should provide a

step-three analysis, a claimant first has the burden to present medical findings that match or equal in severity all the criteria specified by a listing."); *see also Rice v. Barnhart*, 384 F.3d 363, 369-70 (7th Cir. 2004).

Plaintiff argues there is evidence here to support a finding that the C2 criterion is satisfied, and cites to Dr. Nasr's report, the ALJ's treatment of which she contends was "flawed." [DE 15 at 9]. Plaintiff also asserts that the ALJ improperly relied on evidence of her daily activities, while failing to address evidence that showed she is only able to function in a "highly structured environment." [*Id.*]. The Court will address each of these arguments.

### 1.   DR. NASR'S REPORT

The ALJ cited Dr. Nasr's report in support of her step 3 finding. The report indicates "no/mild loss" in response to a question asking whether Plaintiff "[e]xperience[s] marginal adjustment, that is, [has] minimal capacity to adapt to changes in environment." [AR 731]. This finding does in fact support the ALJ's step 3 conclusion that Plaintiff did not meet the paragraph C2 criterion. The regulation states that "[t]he criterion in C2 is satisfied when the evidence shows that, despite [the claimant's] diminished symptoms and signs, [she] ha[s] achieved only marginal adjustment. 'Marginal adjustment' means that [the claimant's] adaptation to the requirements of daily life is fragile; that is, [the claimant] ha[s] minimal capacity to adapt to changes in [her] environment or to demands that are not already part of [her] daily life." 20 C.F.R. Pt. 404, Subpart P, App. 1, § 12.00G(2)(c).  Dr. Nasr, Plaintiff's treating psychiatrist, indicated that Plaintiff did not experience problems with adapting to changes in her environment, and

the ALJ properly relied on that medical opinion in finding that Plaintiff did not satisfy the C2 criterion.

Plaintiff argues that the ALJ's step 3 analysis was "faulty" because, in citing to Dr. Nasr's report, the ALJ referenced Dr. Nasr's finding that Plaintiff had no limitations in "adapting or managing oneself" [AR 19], rather than his finding that Plaintiff had "no/mild" limitations in her capacity to adapt to changes in the environment [AR 731]. Plaintiff points out that "adapting or managing oneself" is a paragraph B, not C, criterion. [DE 15 at 9]. If the ALJ commits an error of law, the decision must be reversed. *Binion*, 108 F.3d at 782. The "adapt or manage oneself" terminology is one of the four areas of mental functioning evaluated under paragraph B. *See* 20 C.F.R. Pt. 404, Subpart P, App. 1, § 12.04B(4); *see also id.* § 12.00E(4) ("Th[e] [adapt or manage oneself] area of mental functioning [under paragraph B] refers to the abilities to regulate emotions, control behavior, and maintain well-being in a work setting."). But it is clear from the ALJ's discussion with Plaintiff's representative at the hearing [AR 39-40]--as well as her reference to that discussion in her decision (i.e., "the claimant's representative argued that the claimant meets the C criteria due to her *inability to adapt to changes in her environment*")-- that the ALJ applied the correct standard under the C2 criterion regarding adapting to changes in the claimant's environment.

Nevertheless, the ALJ referenced the wrong portion of Dr. Nasr's report when she cited to it in support of her step 3 finding.[7] The logical bridge standard is that a reviewing

---

[7] The ALJ did not cite to a specific page in Dr. Nasr's report, but her reference to Dr. Nasr's finding of no limitations in "adapting or managing oneself" appears to be to

court must be able to the trace the ALJ's reasoning such that the decision can be subject to meaningful appellate review. *Briscoe,* 425 F.3d at 351. In the Court's view, the ALJ's error was "akin to a typographical error." *Richard S. v. Comm'r of Soc. Sec.,* No. 19-cv-1088-JES-JEH, 2021 WL 165119, at *9 (C.D. Ill. Jan. 19, 2021). In *Rafael L. T. v. Kijakazi,* No. 20-cv-3469, 2021 WL 5769525 (N.D. Ill. Dec. 6, 2021), it was "difficult for the Court to imagine that typing the word 'occasional' rather than 'frequent' can be attributed to a mere typo." *Id.* at *2 (the ALJ's insistence that the error was a "typo" found to be "so flimsy it borders on pretextual"). Here, it is not difficult for the Court to imagine making the mistake of referencing the portion of Dr. Nasr's report concerning adapting and managing oneself rather than the portion that references adapting to changes in the environment. Moreover, the Court "can still trace the ALJ's decision, despite her [ ] error." *Richard S.,* 2021 WL 165119, at *9.

More importantly, "the result would be the same even if this case was remanded for the ALJ[ ] to fix the [ ] error," *id.,* because Dr. Nasr clearly found the same limitation in the portion of the form that references the C2 criterion. *Compare T Rafael,* 2021 WL 5769525, at *2 (where "the effect of th[e] typo …. was the difference between a finding of disability and no disability"). Therefore, the ALJ's error was harmless. *See Richard S., v. Comm'r of Soc. Sec.,* No. 119CV01088JESJEH, 2020 WL 8455504, at *9 (C.D. Ill. May 26,

---

the "Functional Limitation" section of the report where that exact language is found. [AR 732]. Presumably, the "Functional Limitation" section of the report was intended to address the paragraph B criterion of "adapting or managing oneself" in the work setting, because the language matches up.

2020) (finding harmless error where "the ALJ's 'sloppy cutting and pasting' resulted in two contradictory paragraphs regarding the weight she assigned to non-examining State Agency physicians"), *report and recommendation adopted*, 2021 WL 165119, at * 9 (affirming Magistrate Judge's harmless error finding with regard to "the ALJ's editing mistake"); *Jones v. Astrue*, No. 1:07-cv-0698-DFH-WTL, 2008 WL 1766964, at *10, 13 (S.D. Ind. Apr. 14, 2008) (finding that the ALJ's erroneous reference to the opinions of "the state agency *medical* consultants," when only one of the state agency consultants was a physician, was "a minor oversight" and that "sufficient uncontroverted evidence support[ed] the ALJ's decision for the court to find that the ALJ's mistake did not amount to reversible error"); *see also Fanta v. Saul*, 848 F. App'x 655, 659 (7th Cir. 2021) ("To the extent the ALJ did misspeak, any error was harmless."); *cf. Havlin v. Saul*, No. 2:19-cv-347-PPS, 2020 WL 4727307, at *3 (N.D. Ind. Aug. 14, 2020) ("Typos and innocently incorrect citations are regrettable but almost always harmless.").[8]

---

[8] In a very recent decision, the Seventh Circuit said that, pursuant to the *Chenery* principle, the court "cannot rewrite the record as though the ALJ's central finding was a typo." *Poole v. Kijakazi*, ___ F.4th ___, 2022 WL 765845, at *3 (7th Cir. Mar. 14, 2022). For the reasons discussed, however, the record in this case shows that the ALJ's reference to "adapt and manage oneself" was merely an oversight, so the Court is not "rewriting the record." Nor is *Kastner* comparable to the situation in this case. There, the *Chenery* principle was applied to bar the Commissioner's argument that the ALJ "meant to cross-reference" two sources not mentioned by the ALJ, when "[n]othing in the ALJ's decision indicate[d] that this relatively obscure cross-reference was the basis for the determination." 697 F.3d at 647. This case is different because, as indicated, the record demonstrates the ALJ understood that the paragraph C2 criterion concerns the claimant's ability to "adapt to changes in her environment" rather than her ability to "adapt and control oneself," and the cited report by Dr. Nasr makes a finding of no limitations in both areas, so the reliability of the ALJ's decision is not called into question by her mistake. *See McKinzey*, 641 F.3d at 892 (explaining that administrative error may be harmless and thus a court ought not remand a case to the ALJ where it is convinced that the ALJ would reach the

Plaintiff also argues the ALJ "cherry-pick[ed]" portions of [Dr. Nasr's] report while failing to acknowledge that Dr. Nasr "opined that [Plaintiff's] mental impairments met the 'paragraph C' criteria." [DE 15 at 9]. Plaintiff is referring to the portion of Dr. Nasr's report where he answered "Yes" to the question "[d]oes your patient have a medically documented impairment(s) that is serious and persistent*?" [AR 732], followed by a notation spelling out the regulatory definition of that term, including all three requirements of paragraph C. Even if the Court were to assume that Dr. Nasr understood the question and intended to answer it in the manner in which he did, his "yes" answer was inconsistent with his earlier response of "no/mild loss" to the question asking whether Plaintiff "[e]xperience[s] marginal adjustment, that is, [has] minimal capacity to adapt to changes in environment." [AR 731]. Thus, the ALJ would have been justified in discounting Dr. Nasr's "yes" answer to the question whether Plaintiff had a medically documented impairment that was serious and persistent. *See Prill v. Kijakazi*, 23 F.4th 738, 751 (7th Cir. 2022) (ALJ was entitled to give physician's opinion less weight where it "was internally inconsistent"); *see also Burmester v. Berryhill*, 920 F.3d 507, 512 (7th Cir. 2019) ("The assessment, consisting of a series of checked boxes, was internally inconsistent."). Indeed, Plaintiff's representative admitted the report was internally inconsistent and suggested that the form may have been confusing to Dr. Nasr. [AR 39].

---

same result); *Sarchet*, 78 F.3d at 309 ("When the decision of that tribunal on matters of fact is unreliable because of *serious* mistakes or omissions, the reviewing court must reverse unless satisfied that *no reasonable trier of fact* could have come to a different conclusion, in which event a remand would be pointless." (emphasis added)).

In any event, the ALJ did not specifically mention the portion of the report relied on by Plaintiff. Impermissible cherry-picking consists of "highlighting facts that support a finding of non-disability while ignoring evidence to the contrary." *Martin v. Saul*, 950 F.3d 369, 375 (7th Cir. 2020). Dr. Nasr's "opinion" that Plaintiff satisfied the paragraph C criteria, however, does not constitute "evidence." Whether Plaintiff's mental impairment met the paragraph C listing is a question for the ALJ to answer. *See* 20 C.F.R. § 404.1520b(c)(3)(iv) (whether or not a claimant's impairment meets or medically equals a listing is an "issue[] reserved to the Commissioner").[9] The ALJ therefore was correct to ignore Dr. Nasr's opinion on that question. As the regulations explain, a  statement by a medical provider on an issue reserved to the Commissioner will be deemed to be "inherently neither valuable nor persuasive to the issue of whether [the claimant] [is] disabled … under the Act." *Id.* § 404.1520b(c).[10] As a result, the regulations state that the ALJ is not required to "provide any analysis about how [she] considered" Dr. Nasr's

---

[9] *Cf. Clifford v. Apfel*, 227 F.3d 863, 870 (7th Cir. 2000) ("[A] claimant is not entitled to disability benefits simply because a physician finds that the claimant is 'disabled' or 'unable to work.' Under the Social Security regulations, the Commissioner is charged with determining the ultimate issue of disability." (citing 20 C.F.R. § 404.1527(e)).

[10] The ALJ cited this regulation in her decision, stating that "[t]he undersigned did not provide articulation about the evidence that is inherently neither valuable nor persuasive in accordance with 20 C.F.R. 404.1520b(c)." [AR 24]. Although the ALJ does not identify "the evidence" she did not consider for the reason given, her citation to 20 C.F.R. 404.1520(c) makes it apparent that she had in mind the portion of Dr. Nasr's report where he answers "yes" to the question about whether Plaintiff has a medically documented impairment that is "serious and persistent" as defined by the regulation, i.e., that her impairment meets or medically equals Listing 12.04.

opinion that Plaintiff's mental impairments met the paragraph C criteria. (*id.* § 404.1520b(c)).[11]

### 2.    EVIDENCE OF PLAINTIFF'S DAILY ACTIVITIES

The second reason given by the ALJ for why Plaintiff's impairment did not meet the listing requirements was her ability to take care of her own personal needs and work a part-time job. As she argued concerning Dr. Nasr's report, Plaintiff asserts the ALJ erred because these facts show Plaintiff's ability to adapt or manage herself and thus relate to the paragraph B, not C, criterion. *See* [DE 15 at 9]. But the C2 criterion also relates to the claimant's adaptation abilities, i.e., it asks whether the claimant has adaptation challenges. i.e., "marginal adjustment," as in "minimal capacity to adapt to changes" in her environment (20 C.F.R. Pt. 404, Subpart P, App. 1, § 12.04C(2)), due to her reliance on "[m]edical treatment, mental health therapy, psychosocial support(s), or a highly

_____

[11] Viewed in isolation from its technical regulatory definition, Dr. Nasr's "yes" response to the question of whether Plaintiff has "a medically documented impairment that was serious and persistent" is not inconsistent with his earlier no/mild loss" response to the question of whether Plaintiff has a "minimal capacity to adapt to changes in her environment." It is only when the "serious and persistent" question is read to incorporate the technical regulatory definition of the term "serious and persistent" that an inconsistency arises. Further, the technical definition is incorporated in a way that the person completing the form might overlook it when answering the question. By asking the same question twice but in different ways, it is not surprising the form elicited inconsistent answers. It would not be irrational for the ALJ to have chosen to credit Dr. Nasr's answer to the more specific question directed solely to the "marginal adjustment" criterion, rather than his answer to the broader question that encompassed "marginal adjustment" plus other criteria--criteria that Plaintiff plainly satisfied, such as a medically documented history of the existence of the disorder over a period of at least 2 years--and thus could have been the reason an inconsistent answer was given. But the ALJ did not in any event make that choice; she instead appropriately did not consider the inconsistent answer based on 20 C.F.R. § 404.1520b(c)(3)(iv), as discussed above.

structured setting(s) that is ongoing and that diminishes the symptoms and signs of [the claimant's] mental disorder," *id.* § 12.04C(1). Accordingly, insofar as the cited evidence of Plaintiff's daily activities is concerned, the question for the Court is not whether the ALJ erroneously applied the paragraph B criterion but whether the ALJ sufficiently explained the significance of the cited evidence to the paragraph C2 criterion. *See, e.g.,* *John L. v. Saul*, No. 4:19-cv-18, 2020 WL 401887, at *13 (N.D. Ind. Jan. 23, 2020) ("the logical bridge is missing because the ALJ merely juxtaposed her conclusions with isolated 'supporting' facts without providing connecting rationale").

The Commissioner argues that the significance of the cited evidence regarding Plaintiff's daily activities is apparent from the explanation of the C2 criterion found in the regulation:

> We will consider that you have achieved only marginal adjustment when the evidence shows that changes or increased demands have led to exacerbation of your symptoms and signs and to deterioration in your functioning; for example, you have become unable to function outside of your home or a more restrictive setting, without substantial psychosocial supports (see 12.00D). Such deterioration may have necessitated a significant change in medication or other treatment. Similarly because of the nature of your mental disorder, evidence may document episodes of deterioration that have required you to be hospitalized or absent from work, making it difficult for you to sustain work activity over time.

20 C.F.R. Pt. 404, Subpart P, App. 1, § 12.00G(2)(c).

Plaintiff asserts that the Commissioner's argument is nothing more than a "post-hoc rationalization" of the ALJ's decision that is barred under the *Chenery* doctrine. [DE 17 at 3]. But it does not take any "soaring inferential leap," *Kastner*, 697 F.3d at 647, for

the Court to conclude that the ALJ's reason for citing to the evidence of Plaintiff's daily activities and part-time job following the loss of her mother was to demonstrate that Plaintiff had not shown she had a fragile ability to adapt to the changes in her daily life.[12] The ALJ's decision explicitly rests on a finding that the C2 criterion was not met because of evidence that Plaintiff could adapt to changes in her environment. The Commissioner's argument is not "invent[ing] new findings to rescue an insufficient decision on appeal." *Poole*, __ F.4th at __, 2022 WL 765845, at *3. Although the ALJ did not explain her analysis beyond citing to the evidence, it seems apparent that the evidence is relevant because it demonstrates that Plaintiff was able to adjust to the increased stress and depression she experienced following the tragic and unexpected loss of her mother, which thus shows she has a greater than marginal ability to adapt. *See Richard S.*, 2021 WL 165119, at *9 (citing evidence of the claimant's "daily activities," among other things, in finding evidence failed to establish a marginal adjustment to the living environment or an inability to function outside a highly supported living environment). But in any event, the ALJ's failure to explain why Plaintiff's daily activities are inconsistent with the C2 criterion does not alter the fact that Plaintiff has not cited to evidence showing she met

---

[12] The Seventh Circuit has said that "a person's ability to perform daily activities, especially if that can be done only with significant limitations, does not necessarily translate into an ability to work full-time." *Roddy v. Astrue*, 705 F.3d 631, 639 (7th Cir. 2013). Similarly, part-time work does not preclude establishing disability. *Id.* at 637. The issue here, however, is not whether Plaintiff's daily activities and part-time work precluded a finding of disability but whether they precluded a finding of presumptive disability, and, more specifically, whether they demonstrated an ability to marginally adjust to changes in the environment.

the C2 criterion. *See, e.g., Kautzer v. Kijakazi*, No. 20-CV-511-WMC, 2021 WL 4191430, at *6 (W.D. Wis. Sept. 15, 2021).

### 3.      EVIDENCE OF "HIGHLY STRUCTURED ENVIRONMENT"

Aside from the check-mark in Dr. Nasr's report suggesting an "opinion" regarding Plaintiff's satisfaction of the listing criteria (which, as already explained, is not evidence), Plaintiff also refers to her need for a "highly structured environment" as evidence that she meets the C2 criterion. Plaintiff's reference to a "highly structured environment" invokes the C1 criterion, which requires evidence of "medical treatment, mental health therapy, psychosocial support(s), or a highly structured setting(s) that is ongoing and that diminishes the symptoms and signs of your mental disorder." 20 C.F.R. Pt. 404, Subpart P, App. 1, § 12.00C(1). The regulations explain how the ALJ is to "consider psychosocial supports, structured settings, living arrangements, and treatment" for purposes of paragraph C1:

> Psychosocial supports, structured settings, and living arrangements, including assistance from your family or others, may help you by reducing the demands made on you. In addition, treatment you receive may reduce your symptoms and signs and possibly improve your functioning, or may have side effects that limit your functioning. Therefore, when we evaluate the effects of your mental disorder and rate the limitation of your areas of mental functioning, we will consider the kind and extent of supports you receive, the characteristics of any structured setting in which you spend your time, and the effects of any treatment. This evidence may come from reports about your functioning from you or third parties who are familiar with you, and other third-party statements or information.

*Id.* § 12.00D(1).

The Commissioner argues that the ALJ did not find Plaintiff met the C1 criterion. [DE 16 at 4]. The ALJ's RFC discussion, however, shows otherwise.[13] Specifically, it shows that the ALJ accepted that Plaintiff had ongoing treatment with her therapist and psychiatrist that reduced her symptoms and signs and possibly improved her functioning [AR 21]. Without any discussion to the contrary, the Court presumes the ALJ found the C1 criterion was met by this evidence. *See* footnote 6, *supra*. That the ALJ assumed or found that Plaintiff satisfied the C1 criterion, however, does not compel the conclusion that Plaintiff's mental impairment requires a "highly structured environment" for her to function. Accordingly, the Court reads the Commissioner's argument as being that the ALJ did not find that Plaintiff met the C1 criterion *by virtue of* a "highly structured environment" (as opposed to her ongoing therapy). On that point, the Court agrees.

The listing gives examples of the kinds of psychosocial supports beyond therapy that might be necessary for a claimant who satisfies the C1 criterion, ranging from "psychosocial rehabilitation day treatment or community support program," to "'24/7 wrap-around' mental health services while living in a group home or transitional

---

[13] *See Rice*, 384 F.3d at 370 n. 5 ("Because it is proper to read the ALJ's decision as a whole, and because it would be a needless formality to have the ALJ repeat substantially similar factual analyses at both steps three and five . . . we consider the ALJ's treatment of the record evidence in support of both his conclusions at steps three and five."); *see also Zellweger v. Saul*, 984 F.3d 1251, 1254 (7th Cir. 2021) ("[N]othing in *Chenery* prohibits a reviewing court from reviewing an ALJ's step-three determination in light of elaboration and analysis appearing elsewhere in the decision." (citing *Jeske v. Saul,* 955 F.3d 583, 590 (7th Cir. 2020)).

housing," or living "in a hospital or other institution with 24-hour care." *Id.* § 12.00D(1).

The examples also include:

> You receive help from family members or other people who monitor your daily activities and help you to function. For example, family members administer your medications, remind you to eat, shop for you and pay your bills, or change their work hours so you are never home alone.

*Id.* § 12.00D(1)(a).

> They also include:

> You live alone and do not receive any psychosocial support(s); however, you have created a highly structured environment by eliminating all but minimally necessary contact with the world outside your living space.

*Id.* § 12.00D(1)(g).

There is no evidence in the record that would suggest Plaintiff meets § 12.00D(1)(a). In fact, the ALJ found in her analysis of Plaintiff's RFC that Plaintiff could perform chores but it might take longer; that she took care of her own personal needs and did the normal cleaning; that she took care of her son, including entertaining and feeding him; that she cooked a couple of days a week; and that she cleaned and did the laundry. [AR 22-23].[14]

---

[14] As previously noted, the Court can examine the ALJ's findings at step 5 to support her conclusion at step 3 that Plaintiff does not meet the listing requirements. *Kastner* and the other case Plaintiff cites, *Minnick v. Colvin*, 775 F.3d 929, 936 (7th Cir. 2015), are not to the contrary. "In *Minnick*, both the step-three discussion and the RFC analysis were inadequate"; the court "did not suggest that an ALJ's step-three determination cannot be supported by a discussion of the medical evidence appearing under the RFC heading." *Zellweger,* 984 F.3d at 1255. And in *Kastner*, "the Commissioner's post hoc rationale for the ALJ's decision [ ] did not appear *anywhere* in the ALJ's opinion," while that is "hardly

Nor is there evidence to suggest Plaintiff meets § 12.00D(1)(g). First, Plaintiff does not live alone. Second, the ALJ found that Plaintiff continues to work three days a week for a groomer; that throughout 2018 and 2019, she was looking for work; that, in her hearing testimony as well as during her consultative exam, she "appeared to note that she stopped working due to the death of her mother rather than any of her impairments"; and that, in a November 2019 therapy session, she indicated that she could not work full-time along with being a mother and wife, without "relating it to any impairments." [AR 23]. This evidence demonstrates that Plaintiff has not "created" a "highly structured environment" in her home "by eliminating all but minimally necessary contact with the world outside [her] living space."

Plaintiff quotes her counsel's arguments during the hearing, wherein he stated that Dr. Nasr's report reflected Plaintiff's abilities when "she's doing nothing but staying at home, not working, controlling her environment," as opposed to "when she's in a situation where she has to do things that are outside the ordinary routine, or something happens that will cause her to go off balance," which is when her "condition exacerbates." [DE 15 at 10]. Of course, Plaintiff's counsel's arguments are not evidence.[15] Plaintiff cites no evidence to show that she can function only in a "highly structured environment." As

---

the case [here], where the RFC analysis is extensive and supports the ALJ's determination that [Plaintiff] is not per se disabled." *Id.* (emphasis in original).

[15] *See Brenda L. v. Saul*, 392 F. Supp. 3d 858, 867 & n.5 (N.D. Ill. 2019) (citing *Renard v. Ameriprise Fin. Servs., Inc.*, 778 F.3d 563, 569 (7th Cir. 2015) (attorney's statements and arguments are not evidence); *United States v. Adriatico-Fernandez*, 498 F. App'x 596, 599 (7th Cir. 2012)).

one district court has said, "if weekly psychological counseling and assistance in filling out forms and obtaining social services, while living independently, established an inability to function outside a highly supportive living arrangement, there would be a dramatic increase in the number of individuals who might qualify for Social Security benefits." *Gonsalves v. Astrue*, Civil No. 09-181-BW, 2010 WL 1935753, at *4 (D. Me. May 10, 2010) (citations omitted) (holding that, even if the ALJ "should have discussed the C criteria of Listing 12.04 … any failure to do so was harmless, as there is no evidence that would have allowed him to conclude that those criteria had been met"), *report and recommendation adopted*, 2010 WL 2540945 (D. Me. June 16, 2010).[16]

By way of comparison, in *Sprankles*, where the court found there was evidence to support a remand on the C2 listing criterion, the Commissioner argued that the plaintiff's problems were the result of situational stressors rather than the plaintiff's mental illness, pointing out that the plaintiff's therapy notes showed that her mental health did not

---

[16] *See also Amanda B. v. Comm'r, Soc. Sec. Admin.*, No. 3:20-cv-00434-BR, 2021 WL 4993944, at *7–8 (D. Or. Oct. 26, 2021) (ALJ did not err in rejecting medical opinion that plaintiff had an "inability to function outside a highly supportive living arrangement," where the evidence showed she "was able to care for three young children, transport family members to and from Idaho, and grocery shop," and "the record indicated [her] symptoms improved and remained stable when she was on medication and attending therapy"); *Chamberlain v. Berryhill*, No. 7:16-cv-337-RJ, 2018 WL 845544, at *9 (E.D.N.C. Feb. 13, 2018) (plaintiff "has not demonstrated that merely living with a roommate who does the majority of the housework, cooking, and driving is enough to qualify as a 'highly supportive living arrangement'"); *McLaughlin v. Colvin*, No. 3:13-cv-1136, 2015 WL 1400448, at *3 (M.D. Fla. Mar. 26, 2015) ("Plaintiff's ability to maintain his hygiene, care for his dog, prepare meals, and perform household chores … combined with [his] ability to live alone [ ] preclude Plaintiff from falling under a 'highly supportive living arrangement[.]'").

change significantly after she experienced those situational stressors. 2020 WL 967897, at *5. The court noted that while the plaintiff's treatment records "may not have demonstrated a significant change in her mental capacity or a significant deterioration of her mental health, every other area of [her] life seemed to demonstrate that she was not adapting well to the changes in her environment. In an extremely short period of time, [the plaintiff] got a new boyfriend, lost her job, filed for bankruptcy, committed a felony, and ultimately went to prison." *Id.* The court observed that "[t]his evidence does not seem to indicate that [the plaintiff] was dealing well with the 'situational stressors' or that she was able to sustain gainful employment while experiencing them." *Id.* This evidence was sufficient, the court held, to require a remand "for a proper articulation of the reasoning regarding the paragraph C criteria." *Id.* at *6; *see also Herron v. Comm'r of Soc. Sec.*, 788 F. Supp. 2d 809, 817 (N.D. Ind. 2011) (evidence that might be indicative of a highly supportive living arrangement, which the ALJ failed to consider, included "ex-wife's testimony that she had to treat [the plaintiff] like a child, that she had to seek help for him because his capabilities became progressively more limited, and that 'he didn't ever seem to know what he was doing'") (record citations omitted).

Here, the ALJ's RFC discussion demonstrates no evidence comparable to that in *Sprankles* or *Herron*. Plaintiff has neither called into question the ALJ's RFC findings insofar as those findings impact the step 3 analysis, nor shown that she meets the paragraph C2 criterion by an inability to adapt to changes in her environment. Accordingly, the Court declines to order a remand on this basis.

32

**B.**   **WHETHER THE ALJ'S HYPOTHETICAL TO THE VOCATIONAL EXPERT FAILED TO ACCOUNT FOR PLAINTIFF'S MODERATE LIMITATIONS IN PERSISTING AND MAINTAINING PACE**

The ALJ found at step two of the sequential evaluative process that Plaintiff has moderate limitations in concentration, persistence and pace (CPP). [AR 19]. The ALJ attempted to account for these moderate limitations by restricting Plaintiff's RFC to: (1) simple routine tasks requiring only simple, routine judgments; (2) simple workplace changes; (3) brief, superficial interaction with the public (meaning no more involved interaction than answering discrete questions such as location of an item in a store); (4) occasional interaction with coworkers with no tandem tasks or teamwork; and (5) "work free of fast-paced or timed piece rate production but can meet end of day goals." [AR 19-20].

It is well established that "both the hypothetical posed to the VE and the ALJ's RFC assessment must incorporate all of the claimant's limitations supported by the medical record." *Varga v. Colvin*, 794 F.3d 809, 813 (7th Cir. 2015) (quoting *Yurt v. Colvin*, 758 F.3d 850, 857 (7th Cir. 2014)). "As a matter of form, the ALJ need not put the questions to the VE in specific terms--there is no magic words requirement. As a matter of substance, however, the ALJ must ensure that the VE is apprised fully of the claimant's limitations so that the VE can exclude those jobs that the claimant would be unable to perform." *Crump v. Saul*, 93 F.3d 567, 570 (7th Cir. 2019) (internal quotation marks and citations omitted); *see also Kuykendoll v. Saul*, 801 F. App'x 433, 438 (7th Cir. 2020) ("[W]e will let stand 'an ALJ's hypothetical omitting the terms "concentration, persistence, and pace" when it [is] manifest that the ALJ's alternative phrasing specifically excluded those

tasks that someone with the claimant's limitations would be unable to perform.'") (quoting *O'Connor-Spinner v. Astrue*, 627 F.3d 614, 619 (7th Cir. 2010)).

Plaintiff does not challenge the ALJ's RFC and VE hypothetical insofar as her limitations in concentration are concerned. Instead, Plaintiff argues that the ALJ's RFC and hypothetical fail to impose "*any* limitations in persistence and pace." [DE 17 at 5 (emphasis added)]. But the ALJ did attempt to account for Plaintiff's limitations in persistence and pace by restricting her RFC to "work free of fast-paced or time piece rate production but can meet end of day goals." The issue is whether those restrictions are sufficient to account for Plaintiff's persistence and pace limitations, and whether those terms were defined with enough specificity to provide meaningful limitations.

Citing *Varga*, 794 F.3d 809, and *DeCamp v. Berryhill*, 916 F.3d 671 (7th Cir. 2019), Plaintiff argues that the Seventh Circuit has rejected the term "no fast paced production" as sufficient to reflect a moderate limitation in CPP. In *Varga*, 794 F.3d at 815, the court found it "problematic that the ALJ failed to define 'fast paced production,'" stating that, "[w]ithout such a definition, it would have been impossible for the VE to assess whether a person with [the plaintiff's] limitations could maintain the pace proposed." And in *DeCamp*, 916 F.3d at 676, the court observed that "there is no basis to suggest that eliminating jobs with strict production quotas or a fast pace may serve as a proxy for including limitation on concentration, persistence, and pace."

But in *Martin*, 950 F.3d at 374, the court said that *Varga* was not "root[ed] [ ] in vagueness." Instead, the *Martin* court said, the *Varga* court "reversed because the ALJ failed to include the claimant's significant problems concentrating in the RFC

34

determination." *Id.* Thus, the *Varga* court listed the seven areas related to CPP in which the state agency consultant's assessment of the plaintiff's mental RFC found moderate difficulties, 794 F.3d at 814, and then held that the limitations imposed in the ALJ's RFC, including "free of fast paced production requirements," failed to account for all of those difficulties, *id.* at 815. Similarly, in *DeCamp,* the court held that the ALJ's hypothetical limiting the plaintiff to "unskilled work" with no "fast paced production line or tandem tasks" did not account for the plaintiff's moderate limitations in four areas that were identified by the state agency doctor (whose opinion the ALJ cited to support her finding). 916 F.3d at 673, 676.

The Commissioner points out that, unlike in *Varga* and *DeCamp*, Plaintiff has not cited the evidence in the record on which she relies for additional CPP restrictions beyond those imposed by the ALJ. [DE 16 at 7]. Even if this is so, the Commissioner errs in citing *Jozefyk v. Berryhill*, 923 F.3d 492, 498 (7th Cir. 2019), to support a harmless error argument on that basis. In *Crump*, the Seventh Circuit made clear that *Jozefyk* turned on the lack of evidence, i.e., "the claimant had not testified about any restrictions in his capabilities related to concentration, persistence, or pace, and the medical evidence did not otherwise support any such limitations." 932 F.3d at 571 (citing *Jozefyk*, 923 F.3d at 498).[17] Here,

_____

[17] *See also Lockett v. Saul,* 834 F. App'x 236, 239 (7th Cir. 2020) ("no doctor opined that [plaintiff] had restrictions beyond those the ALJ found"); *Anne M. v. Kijakazi*, No. 20 C 6053, 2022 WL 683668, at *7 (N.D. Ill. Mar. 8, 2022) ("Simply put, without any medical evidence to document any concentration issues, it was entirely appropriate for the ALJ not to include any such limitations in her RFC finding."); *Doretha H. v. Kijakazi*, No. 2:20-cv-339, 2021 WL 4317304, at *6 (N.D. Ind. Sept. 22, 2021) ("In the present case, there is no objective medical evidence in the record, nor does [the plaintiff] cite any records

Plaintiff points out generally that she "has been treating consistently with both her psychiatrist, Dr. Nasr, and her psychologist, Dr. Karen Eggen, since 2006," and she "testified consistently with the medical treatment notes how her impairments affect her ability to maintain concentration, persistence and pace." [DE 16 at 7]. While perhaps more detailed citation to the evidence in the record would have been helpful, the Court agrees with Plaintiff that the record does contain evidence of pace and persistence limitations that are not accounted for in the RFC or VE hypothetical, and that the ALJ's failure to discuss this evidence means there is no logical bridge between the ALJ's moderate CPP limitations and the RFC restrictions she imposed related to those limitations. *See Kline ex rel. J.H.-K. v. Colvin,* No. 11 C 50376, 2014 WL 69953, at *12 (N.D. Ill. Jan. 9, 2014) (although the plaintiff's arguments are undeveloped, the Court cannot ignore significant errors in the ALJ's opinion identified by the plaintiff) (citing *Firkins v. Astrue,* 1:09–CV–00923–JMS, 2010 WL 3037257, *4 (S.D. Ind. Aug. 3, 2010) (stating that even an underdeveloped argument is not necessarily forfeited when the district court knew and understood the argument the party intended to make).

The ALJ's discussion of her moderate CPP limitations finding is as follows:

> With regard to concentrating, persisting or maintaining pace, the claimant has a moderate limitation. The claimant's providers found that she could not concentrate or work at a consistent pace. Yet, they all also indicated that the claimant had anywhere from no impairment to a moderate impairment in sustaining concentration and work performance (Exhibits 6F/2-7, 17F). The claimant's doctor noted as well that she had

---

supporting her argument, that would suggest that the hypothetical question failed to account for her moderate limitations in concentration, persistence, or pace.").

> focused attention (Exhibits 3F/1-8, 15F, 20F/2- 24). Dr. Durak
> found that the claimant had good concentration (Exhibit 8F).

[AR 19].

The only thing the Court can tell from this discussion is that the ALJ found a moderate limitation in CPP. The ALJ does not explain whether the moderate finding applied to all three components of CPP, nor does she tie the moderate finding to any specific evidence in the record. Instead, the focus of the paragraph seems to be on negating a CPP limitation greater than a moderate one, based on evidence that purportedly is inconsistent with the extreme limitation findings in Dr. Eggen's statement and Dr. Nasr's report.[18] In short, the ALJ found a moderate CPP limitation but she did not identify at that time the evidence on which that finding was based.

---

[18] Plaintiff does not challenge the ALJ's moderate CPP limitation finding, but the Court notes that, in making this finding, the ALJ does not adequately explain her rejection of the cited evidence of a more extreme limitation. Dr. Nasr's observations regarding Plaintiff's focused attention during sessions with her is not inconsistent with Plaintiff's testimony about her mental impairments. *See Crump,* 932 F.3d at 571 (ALJ improperly discounted opinion of the plaintiff's treating psychiatrist where the psychiatrist "found only that she could pay attention in the doctor's office and thus in the context of a structured, relatively short mental health examination, an altogether different environment than a full day at a competitive workplace with sustained demands"). And the ALJ's finding that the long-term disability form completed by Dr. Eggen on Plaintiff's behalf was inconsistent with her opinion of a more extreme limitation is not supportable. The ALJ observed that Dr. Eggen stated that Plaintiff had no ability to concentrate or meet productivity expectations while also indicating in checked boxes on the form that Plaintiff had "0" impairment in her ability to concentrate or sustain work performance. [AR 558 (citing AR 557-561)]. But the ALJ failed to note that Dr. Eggen specifically qualified her "0" impairment findings with a handwritten comment next to the checked boxes that "All of these vary with mood, *when she is stable there is no impairment*." [AR 558 (emphasis added)].

Later in her decision, however, the ALJ does provide a specific explanation for her RFC limitation of work "free of fast-paced or timed piece rate production but can meet end of day goals":

> As for the opinion evidence regarding the claimant's mental limitations, State agency psychological consultants found that she could handle simple instructions and manage occasional contact with the public. The undersigned finds the opinions of the State agency psychological consultants to be persuasive, as they are supported by and consistent with the objective evidence. Specifically, the clamant is limited to simple tasks because of trouble concentrating and a tendency to be distracted due to ADHD and bipolar disorder. The claimant requires no production rate pace because of increased symptoms of bipolar disorder in stressful situations. The claimant has social limitations because of difficulty interacting with others due to her bipolar disorder, which causes mood swings.

[AR 24 (citations omitted)]. Here, the ALJ has done what the Seventh Circuit has instructed she should do: find "specific deficits in concentration, persistence, or pace and then connect[ ] them to the assigned limitations." *Kuykendoll,* 801 F. App'x at 438. The problem is that the only deficits the ALJ addresses relate to concentration in stressful situations, as found by the state agency psychological consultants. The ALJ's findings related to concentration in stressful situations do not adequately cover all aspects of Plaintiff's moderate limitations in CPP. As the Seventh Circuit explained, "observing that a person can perform simple and repetitive tasks says nothing about whether the individual can do so on a sustained basis, including, for example over the course of a standard eight-hour work shift." *Crump*, 932 F.3d at 570. Insofar as persistence and pace are concerned, the ALJ's mental limitations are inadequate in at least two respects.

First, the Seventh Circuit has held that elimination of "fast paced production requirements" does not adequately account for pace limitations. For instance, in *Paul v. Berryhill*, 760 F. App'x 460 (7th Cir. 2019), the ALJ posed a hypothetical that limited the claimant to "work that could be performed at a 'flexible pace,' meaning that it is 'free of production rate pace where there are no tandem tasks or teamwork or one production step that's dependent upon the prior step.'" *Id.* at 463. The Seventh Circuit found "well-taken" the claimant's argument that this limitation did "not adequately address her difficulties, because it fails to specify the particular pace at which she can work." *Id.* at 465. The court explained that the RFC and hypothetical question did "not acknowledge [the plaintiff's] moderate limitations with following a schedule and sticking to a given task. And the ALJ's reference to 'flexible pace' is insufficient to account for [the plaintiff's] difficulties maintaining focus and performing activities within a schedule, because the reference excludes only production-pace employment. Without more, the VE cannot determine whether someone with [the claimant's] limitations could maintain the proposed pace or what the proposed pace even is." *Id.* (citation omitted); *see also Mischler v. Berryhill*, 766 F. App'x 369, 376 (7th Cir. 2019) (holding that "the ALJ's failure to define 'piecework' or 'fast-moving assembly line work'" (which are not elsewhere defined) makes it impossible for a VE to assess whether a person with those limitations 'could maintain the pace proposed'") (quoting *Varga*, 794 F.3d at 815)).[19]

---

[19] *Compare Dudley v. Berryhill,* 773 F. App'x 838, 842 (7th Cir. 2019) (upholding ALJ RFC "excluding work above an average pace, at a variable pace, or in crowded, hectic environments"); *Martin*, 950 F.3d at 374 (upholding "pace-related limitations" requiring "flexibility and work requirements that were goal-oriented," stating that "[t]he law does

The ALJ noted that Plaintiff testified about how her mental impairments caused her difficulties in performing a job when she was manic and that she could not handle the stress or productivity requirements of her former job. But the ALJ did not discuss how this testimony would affect the pace at which the Plaintiff was able to perform a job. While the ALJ noted that Plaintiff's prescribed medications facilitated improvements in her symptoms, she did not explain how those improved symptoms enabled Plaintiff to consistently keep pace under normal job conditions when she still suffered hypomanic and depressive phases throughout the year.

Second, the elimination of "fast-paced production requirements" within the RFC does not adequately account for persistence limitations. *See, e.g., Michael S. L. v. Comm'r of Soc. Sec.*, No. 19-cv-1083-RJD, 2020 WL 1955253, at *5 (S.D. Ill. Apr. 23, 2020). Plaintiff's testimony related her limitations to a large degree to persistence issues, so it is surprising that the ALJ never explicitly addressed that issue. Yet, the ALJ apparently found no persistence issues, because she added a qualifier to the restriction of "no fast-paced production requirements" that Plaintiff "can meet end day goals." As far as the Court can tell, the ALJ included this qualifier to Plaintiff's RFC limitations without making any findings or performing any analysis of the evidence connected to it. Instead, the qualifier appears to have been added as a result of the VE's testimony.

---

not require ALJs to use certain words, or to refrain from using others, to describe the pace at which a claimant is able to work"); *Nina Joyce H. v. Saul, No.* 18 C 4913, 2020 WL 212771, at *9 (N.D. Ill. Jan. 14, 2020) (upholding work restricted "to average production pace" against charge that it was not "a true restriction").

The ALJ's original hypothetical to the VE did not have in its description of the work to be performed any language about an ability to meet end of day goals. The ALJ's initial hypothetical incorporated restrictions apparently intended to take into account limitations in concentration and social interactions only, as described by the state agency consultants. Specifically, the hypothetical restricted the work to simple and routine tasks, routine judgments, and simple work-place changes (concentration issues), and it also limited the work to "no tandem tasks or teamwork where one production step is dependent no [sic] a prior step" (social interaction limitations). [AR 72]. The VE testified that the ALJ's restriction to simple tasks (which was due to Plaintiff's limitations in concentration) meant that Plaintiff could not do her past work as a data entry clerk, because that was a semi-skilled position. [*Id.*]. But the ALJ testified to other work in the economy that a hypothetical worker could do with those limitations. The VE added the comment at the end of this testimony, however, that the jobs he had identified "are definitely more individualized, goal oriented. They would have end of the day goals but not hourly quotas for pace." [AR 73].

Apparently in response to this last statement by the VE, the ALJ immediately asked a second hypothetical, which added that the work must be "limited to a work environment free of fast-paced or time piece-rate production work, but the person can meet end of day goals." [AR 74]. The VE testified in response to the second hypothetical that the same jobs would be available. [*Id.*]. Significantly, the ALJ followed up by asking the VE about his opinions regarding an employer's tolerance for "absences in a competitive work environment" and "time off task beyond regularly scheduled breaks

and meal periods." [*Id.*]. The VE testified that a typical tolerance for absences would be no more than one day per month, and that tolerance for off-task time would be no more than 10 percent in addition to normal breaks and lunch, with anything more than that creating a sustainability issue. [AR 74-75]. This discussion was followed by a third hypothetical posed by Plaintiff's counsel, who asked the VE about the availability of jobs if the person had end-of-day goals that could be stretched out over a 24-hour period, "so the person could do the job maybe for an hour or two, take a break of two hours, do it again for another couple of hours, take a break," etc., because of difficulty with the ability to sustain concentration, i.e. persistence issues. [AR 75-76]. The VE responded that Plaintiff's counsel was describing a situation where the worker is able to stretch the same amount of productivity that would be expected out of 8 hours over a 10 or 12 hour period. The VE testified that would be considered "accommodated" employment, and there would *not* be jobs available with that limitation. [AR 76].

Plaintiff's counsel stated that his hypothetical reflected the conditions under which Plaintiff performed her previous job working from home as a medical coder. As the VE's testimony revealed, Plaintiff was only able to sustain that employment because her persistence and pace limitations had been, as the VE testified, "accommodated" by her employer. In fact, the evidence shows she lost her job when her employer no longer wanted to accommodate her limitations.[20] Despite all this, the ALJ's written decision

---

[20] Plaintiff's testimony indicated she lost her employment when she asked to go back to work part-time. But her employer reported to the Commissioner that Plaintiff did not

made RFC findings that included the qualifier "can meet end of day goals" without any persistence or pace limitations and without any discussion of the evidence that supported limitations in the area. The ALJ clearly was aware of these issues and their potential to be relevant based on the evidence, as she asked the VE about an employer's tolerance for "absences in a competitive work environment" and "time off task beyond regularly scheduled breaks and meal periods." Knowing that the VE had testified there would not be any jobs with limitations in this area of the type described, the ALJ did not find any RFC restrictions in persistence. But she did not explain why, failing to discuss the issue at all.[21] In short, the ALJ failed to explain how the qualifier of "can meet end of days goals" is supported by the evidence in the record, or how it relates to the ALJ's finding of moderate limitations in concentration, persistence and pace. The decision failed to do the required analysis on the front end, and instead inserted the qualifier of no persistence limitations at the back end through the VE's testimony.

---

consistently meet productivity standards, which suggests that her termination was related to a larger issue than her merely requesting to work part-time.

[21] In this respect, this case is similar to *Winsted v. Berryhill*, 923 F.3d 472 (7th Cir. 2019). There, the court reversed on the basis of the ALJ's failure to reflect the plaintiff's moderate limitations in CPP in either the RFC or VE hypothetical, explaining: "The ALJ asked two additional hypothetical questions to the VE about an individual who would either be off task 20% of the workday or would have two unscheduled absences per month—seemingly having in mind someone with 'moderate difficulties with concentration, persistence, and pace.' The VE responded that neither individual could sustain employment. But these responses are not reflected in the ALJ's decision. Because the ALJ did not include [the plaintiff's] difficulties with concentration, persistence, and pace in the hypothetical he *did* consider, the decision cannot stand." *Id.* (emphasis in original).

Instead of explicitly discussing the "meets end of day goals" qualifier, the ALJ only cites generally to Dr. Nasr's report and Plaintiff's hearing testimony for her pace and persistence limitations. [AR 24]. In addition, she cites a single treatment note where Dr. Eggen recounts that Plaintiff noticed the stress of her son's birthday party affected her mood by making her depressed. [AR 691 (Ex. 16F/5)]. The Court cannot assess whether the ALJ properly limited Plaintiff's restrictions in persistence and pace. While she cites to Plaintiff's hearing testimony generally, she does not adequately explain her basis for discounting the specific parts of Plaintiff's testimony related to her pace and persistence limitations.[22] And she singles out one treatment note by Dr. Eggen as demonstrating that Plaintiff's CPP issues are limited to stressful situations when that singular note does not fully reflect Plaintiff's symptoms and causes as shown in the rest

---

[22] It is true that the ALJ found that Plaintiff's "statements concerning the intensity, persistence and limiting effects of [her] symptoms are not entirely consistent with the medical evidence and other evidence in the record." [AR 22]. But the ALJ is not tasked with determining whether Plaintiff's symptoms are fully consistent with the evidence. Rather, the ALJ is instead instructed to determine whether the allegations concerning the intensity, persistence, and limiting effects of these symptoms "can reasonably be accepted as consistent with the objective medical evidence and other evidence." 20 C.F.R. §§ 404.1529(a), 404.1529(c)(4), 416.929(a), 416.929(c)(4) (describing how the Social Security Administration considers symptoms). Requiring that symptoms "can reasonably be accepted as consistent" with objective evidence is a less rigorous standard than requiring them to be "fully consistent" with the evidence. See, e.g., Minger v. Berryhill, 307 F. Supp. 3d 865, 871 (N.D. Ill. 2018). Nonetheless, an ALJ's use of an oft-repeated phrase such as "not entirely consistent" is only problematic "when the ALJ substitutes it for a proper, full-bodied explanation of why credibility is lacking." Hammerslough v. Berryhill, 758 F. App'x 534, 539 (7th Cir. 2019). Here, the ALJ's explanation does not entail pointing to evidence the ALJ relied upon in rejecting Plaintiff's testimony concerning her limitations in persistence and pace, as she only cites the state agency consultants and, as discussed herein, those reports also do not address whether Plaintiff had any persistence and pace limitations.

of Dr. Eggen's therapy notes. Other therapy notes the ALJ did not cite would support greater limitations than the stress-related limitation the ALJ imposed. "[A]n ALJ need not mention every piece of evidence, so long [she] builds a logical bridge from the evidence to [her] conclusion." *Denton v. Astrue*, 596 F.3d 419, 425 (7th Cir. 2010). Here there is no logical bridge because the ALJ cited no evidence to support her RFC finding of "can meet end day goals," and, further, the record contains evidence that is inconsistent with that finding.

The Court acknowledges that the ALJ found that the extreme limitations in Plaintiff's ability to complete work found in both Dr. Eggen's statement and Dr. Nasr's report were not persuasive. But rejecting Dr. Eggen's extreme limitation of an inability to complete tasks for more than ten minutes does not negate Dr. Eggen's statement that the only reason Plaintiff was able to successfully maintain her previous job as a medical coder was that she "could start and stop her workday as needed, as long as she completed her hours." [AR 556]. The ALJ does not specifically discuss this portion of Dr. Eggen's report. Moreover, the reason the ALJ gave for discounting Dr. Nasr's extreme limitation in Plaintiff's ability to perform at a consistent pace without unreasonable number and length of rest periods was that it was inconsistent with his finding that she had only a moderate loss in the area of "ability to concentrate, persist or maintain pace." This inconsistency finding does not negate Dr. Nasr's opinion regarding the moderate limitation, however, which is at issue here.[23]

---

[23] The ALJ also noted the evidence of Plaintiff's focused attention during mental status exams, and Plaintiff's admission that she saw improvement in her symptoms when

45

An additional issue with the ALJ's analysis of the opinions of mental health professionals is cherry picking evidence that supports her conclusion yet ignoring a contrary line of evidence. The ALJ noted that Dr. Eggen opined in 2017 that the Plaintiff had no ability to concentrate or meet productivity expectations before noting that she had no impairment in her ability to concentrate or sustain work performance. [AR 24]. The ALJ also made note of the fact that later exams showed lesser symptoms, ultimately finding that opinions were not consistent. To be sure some, but not all, of the inconsistencies were self-contained on forms, yet the ALJ also placed special emphasis on the timeline of varying opinions prior to calling those opinions into doubt based upon the fact they were changing, or inconsistent. This is problematic because Plaintiff indicated that her symptoms worsened from stressful situations, such as work or traveling, and the Plaintiff stopped working prior to some of these exams. [AR 231-238; AR 253-260]. And, the nature of Plaintiff's mental health issues are such that symptoms arose sporadically and were of varying duration. [AR 55-56; AR 63-64]. The ALJ did not address these reasons for changing symptoms at all or consider whether such issues were the source of changing opinions. This comes at the very least uncomfortably close to the impermissible "cherry-picking" the evidence. *See Plessinger v. Berryhill*, 900 F.3d 909, 915 (7th Cir. 2018) (ALJ "misconstrued (or worse, 'cherry-picked')" statements from medical opinion relied upon: "ALJs are not permitted to cherry-pick evidence from the record to

---

taking Latuda [AR 24], neither of which negate the identified moderate CPP limitations in Dr. Eggen's statement and Dr. Nasr's report, which the ALJ in fact adopted.

support their conclusions, without engaging with the evidence that weighs against their findings").

As the Seventh Circuit stated in *Crump*, 932 F.3d at 571, the Court sees "the discounting of [Plaintiff's mental health professionals'] opinion[s] in keeping with and indeed compounding the ALJ's error" in failing to explain and/or account for moderation limitations Plaintiff had in persistence and pace. This is particularly so insofar as the ALJ failed to discuss or discredit with citation to evidence the opinions of those treating mental health professionals regarding the amount of time Plaintiff would be off-task. *See, e.g., Michael Z.*, 2019 WL 13094919, at *3 ("The question is not whether the ALJ identified this evidence in his decision, but whether he explained 'why that evidence was rejected.'" (quoting *Moore*, 743 F.3d at 1123)).

A final word is in order regarding the ALJ"s finding that the state psychological consultants' reports were persuasive, and her reliance on the narrative portion of those reports for her CPP limitations. The Seventh Circuit has said that an ALJ can rely on the agency doctors' narrative conclusions to translate their residual-functional-capacity recommendations. *See, e.g., Urbanek v. Saul,* 796 F. App'x 910, 915 (7th Cir. 2019). But here, the state agency consultants' narrative did not speak to the issues of persistence and pace. *Compare Raydene E. v. Kijakazi*, No. 19 C 3125, 2021 WL 5280949, at *3 (N.D. Ill. Nov. 12, 2021) (where state reviewing physicians opined that "[w]hile ongoing symptoms may reduce efficiency and stress tolerance, this is not to the degree as to prevent ability to engage in work activity within an average schedule and work week the majority of the time"). The Seventh Circuit has said that, even though "an ALJ may rely on a narrative

explanation, the ALJ still must adequately account for limitations identified elsewhere in the record, including specific questions raised in check-box sections of standardized forms." *DeCamp,* 916 F.3d at 676. Dr. Nasr's form was not prepared until after the state agency consultants' reports, so the state agency consultants' narratives did not take his checked-box findings into account. Moreover, the state agency consultants noted that Plaintiff's employer had reported that Plaintiff "[d]id *not* consistently meet productivity standards." [AR 92 (emphasis added)]. The Court finds it difficult to reconcile the ALJ's qualifier of "can meet end of day goals" with Plaintiff's former employer's report that Plaintiff consistently failed to meet productivity standards.

For all of the reasons explained above, the ALJ's RFC analysis did not adequately address Plaintiff's difficulties with persistence or pace so as to provide a logical bridge for the restrictions she placed in that area in her hypothetical to the VE. This is especially true as to the qualifier to the CPP limitations in the RFC finding that Plaintiff "can meet end day goals." Although the ALJ did not define what she meant by the qualifier, the VE's explanation in response to Plaintiff's counsel's hypothetical suggests that an ability to meet end of day goals means an ability to consistently keep pace and persist throughout an 8-hour workday so that end of day goals are met in that time-period. The ALJ did not explain if that is the meaning she also had in mind when she added the qualifier to Plaintiff's RFC. Nor did she provide a logical bridge based on the evidence to support the qualifier if that is what she had in mind. In *Pavlicek v. Saul,* 994 F.3d 777 (7th Cir. 2021), the Seventh Circuit noted that social security regulations define a moderate limitation "to mean that functioning in that area is 'fair.'" *Id.* at 783 (citing 20 C.F.R. Pt.

404, Subpt. P, App. 1). The Seventh Circuit then said that "a 'moderate' limitation in performing at a *consistent* pace seems consistent with the ability to perform simple, repetitive tasks at a consistent pace." *Id.* (emphasis added). Here, however, the ALJ did not make any finding that Plaintiff could perform at a consistent pace, or that she could do so consistently, i.e., she had normal persistence. In *Pavlicek*, the court held that the ALJ had reasonably relied on the state agency consultants' narrative RFC in the consistent pace finding. 994 F.3d at 783. Here, however, as discussed, the state agency consultants only addressed concentration and stress-related limitations. They did not discuss pace or persistence limitations from Plaintiff's bipolar symptoms, even though they acknowledged Plaintiff's employer's report that she consistently failed to meet productivity standards. If there is no evidence to support a consistent pace finding (and the ALJ made no finding there was), then the qualifier "can meet end of day goals" would not be appropriate. In fact, the qualifier appears to be inconsistent with evidence in the record that the ALJ failed to discuss in any meaningful way.[24] Accordingly, the ALJ's decision denying benefits must be reversed and remanded.

---

[24] *See LaValley v. Kijakazi*, No. 20-CV-1432-SCD, 2021 WL 5200238, at *6 (E.D. Wis. Nov. 8, 2021) (distinguishing *Pavlicek* because "the ALJ here did not reasonably rely on the consultants' narrative RFC; rather, he failed to address several key limitations found in that narrative or explain why they were not included in the RFC"; also noting that "the definition of moderate in the regulations pertains to the consultants' ratings of the paragraph B criteria," not "to the degree of limitation in the actual RFC" (citing 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.00(F)(2)(c), and SSA Programs Operations Manual System, DI 24510.065(B)(1)(c)).

## <u>CONCLUSION</u>

Based on the foregoing, the Commissioner's final decision is **REVERSED AND REMANDED** for further proceedings. The Court **DIRECTS** the Clerk of Court to **ENTER JUDGMENT** in favor of Plaintiff and against Defendant.

So ORDERED this 31st day of March, 2022.

s/ Joshua P. Kolar
MAGISTRATE JUDGE JOSHUA P. KOLAR
UNITED STATES DISTRICT COURT